UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MID-AMERICAN SALT, LLC<br>f/k/a MIDWEST SALT OF FORT<br>WAYNE, LLC<br><br>    Plaintiff,<br><br>v.<br><br>D.J.'S LAWN SERVICE, INC.<br>d/b/a D.J.'S LANDSCAPE MANAGEMENT,<br><br>    DefeNCAnt. | )<br>)<br>)<br>)<br>)<br>)<br>)   CASE NUMBER: 1:16 CV 280<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| D.J.'S LAWN SERVICE, INC.<br>d/b/a D.J.'S LANDSCAPE MANAGEMENT,<br><br>    Counterclaim Plaintiff,<br><br>vs.<br><br>MID-AMERICAN SALT, LLC<br>f/k/a MIDWEST SALT OF FORT<br>WAYNE, LLC<br><br>    Counterclaim DefeNCAnt | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

After an agreement for the sale and purchase of rock salt went awry, Mid-American Salt,
LLC f/k/a Midwest Salt of Fort Wayne, LLC ("MAS") filed this suit seeking relief for breach of
contract by the Defendant, D.J.'s Lawn Service, Inc. ("DLS"). DLS counterclaimed. Before the
Court are MAS's Motion for Partial Summary Judgment [DE 54] as well as DLS's Cross-motion
for Summary Judgment. [DE 57]. For the following reasons, MAS's Motion will be DENIED
and DLS's Motion will be GRANTED in part and DENIED in part.

## APPLICABLE STANCARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003). "Parties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.*

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.' " *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v.*

*Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255. Mindful of these staNCArds, the Court turns now to the facts of the case.

## FACTUAL BACKGROUND

For the most part, the parties agree on the underlying facts in this case. Where the parties dispute relevant facts, those will be specifically referenced herein.

### A. The Parties

DLS is a Michigan for-profit regional lawn and landscape business that offers comprehensive, year-round landscape services to its clients, including snow and ice management. D.J. VanderSlik ("VanderSlik") is the president and sole shareholder of DLS. (Affidavit of DJ VanderSlik, at ¶2; hereafter "VanderSlik Aff. at ¶__"). From time to time, DLS purchases rock salt used to prevent snow and ice from accumulating on roads and parking lots and resells the salt to its customers. (*Id.* at ¶s 4-5)

MAS is a domestic procurer and reseller of bulk rock salt and other deicing products. As a procurer of bulk rock salt, MAS purchases salt from one party and then resells it to its customers at a higher price. (Complaint, ¶s 3, 4, 9). It operates, therefore, as a middle man. Andrew Thiele ("Thiele") is the president of MAS.

### B. The Contracts

In 2014, MAS purchased salt for resale from various suppliers, including Chemical Equipment Labs, Inc. ("CEL"). (Deposition of Andrew Thiele [DE 58-2], at p. 50; hereafter "Thiele Dep. at ___."). In August, 2014, Thiele and VanderSlik began a series of discussions relating to the sale of bulk rock salt from MAS to DLS. (VanderSlik Aff. at ¶8). However, before

VanderSlik was willing to finalize an agreement, he requested an opportunity to inspect the inventory of MAS's supplier. (*Id.* at ¶9). At that time, Thiele had not disclosed to VanderSlik that CEL was its supplier.

On August 28, 2014, Thiele and VanderSlik met in Michigan to board a plane to Philadelphia to inspect a salt stockpile in Wilmington, Delaware. While en route, VanderSlik and Thiele discussed the terms of a potential sale of the bulk rock salt. During their meeting, Thiele presented VanderSlik with a document titled "Mutual Non-Disclosure Non Circumvent Agreement," (the "NCA"). (DE 58-4, Exh. D). The NCA was designed to protect MAS from potential customers bypassing MAS to purchase salt directly from MAS's supplier. Paragraph 3 of the Agreement provided as follows: "All Confidential Information exchanged between the Parties pursuant to this Agreement: (a) shall not be used to circumvent [MAS] and do business directly with the supplier…" (*Id.* at ¶3a). Paragraph 4 provides an exception to the restrictions in Paragraph 3: "The obligations of paragraph 3 shall not apply, however, to any information which: (a) is already in the public domain or becomes available to the public through no breach of this Agreement by the receiving party …" (*Id.* at ¶4a).

Paragraph 9 of the NCA states:

> [MAS] shall provide the name and address of its confidential supplier of Bulk Rock Salt for the purpose of inspecting the quality of the salt. The Customer is bound by this agreement and agrees not to circumvent [MAS] and attempt to purchase salt directly from the named supplier. If the customer circumvents [MAS] and purchases directly from the confidential source, the Customer agrees to compensate [MAS] for the sales commission and fees that would have applied if the salt had been purchased through [MAS].

(*Id.* at ¶9). There is no temporal or geographic limitation in the NCA. However, in his deposition, Thiele testified that his "understanding" of the duration was that it "specifically was for that season." (Thiele Dep. at 214).

VanderSlik testified that he understood that unless and until he signed the NCA, Thiele would not identify MAS's supplier to DLS. (Deposition of VanderSlik, at p. 65, hereafter "VanderSlik Dep. at ___.")

When Thiele and VanderSlik arrived in Philadelphia, they were met by John Morgan, a principal at CEL, who accompanied the men to CEL's Wilmington, Delaware salt storage facility. (VanderSlik Dep. at 68). Also present in Wilmington was Ed Morgan, who was also a principal at CEL and John's brother. (*Id.*) VanderSlik had not personally met the Morgans prior to this interaction; however, VanderSlik testified that he was aware of the Morgans and CEL prior to that day as they were well known in the industry and attended industry trade shows. (VanderSlik Dep. at 54-55: "I was aware of them prior to my meeting with them. They're known in the industry and go to snow and ice shows."). Thiele, VanderSlik and the Morgans spent approximately three hours on-site inspecting rock salt before Thiele and VanderSlik returned to Michigan.

Upon their return, Thiele presented VanderSlik with a second document titled "Bulk Rock Salt Sales Agreement," ("the BRSSA"). (VanderSlik Dep. at 72; DE 58-5, Exhibit E). Prior to VanderSlik signing the agreement, the two discussed timing, payment, logistics, and additional sales. (VanderSlik Dep. at 73). At the conclusion of the meeting, VanderSlik signed the BRSSA. Pursuant to the terms of the BRSSA, MAS was to sell 27,500 tons of bulk rock salt to DLS in exchange for $2,585,000. (DE 58-5). The salt was to be delivered by MAS to Verplank Dock in Muskegon, Michigan.

The payment terms under the BRSSA were as follows:

The total agreed price is $2,585,000.00 (27,500 TONS x $94.00/US TON) with a down payment of $1,551,000.00 via wire transfer due by 3PM EST on 9/3/2014. The remaining$1,034,000 (40%) will be due via wire transfer upon the vessel arriving at Verplank Dock. The vessel will not discharge until final payment is received. Delay in final payment will result in demurrage to the [DLS].

(DE 58-5 ¶2). The parties further agreed to work cooperatively as the agreement confirms "the Spirit of Mutual Cooperation and Good Faith." (*Id.* at ¶15).

Prior to the initial payment due date, DLS discovered that it was having trouble obtaining financing for the transaction, as the transaction was unusually large for DLS. (Supplemental Affidavit of VanderSlik [DE 65-1], at ¶10, hereafter "VanderSlik Supp. Aff. At ___"). In particular, DLS's lender was concerned that the initial payment was being made directly to MAS, rather than in escrow, and that the remaining $1.5 million would also be sent directly to MAS without any guarantee of performance by MAS. (VanderSlik Supp. Aff. ¶10-11).

Because of these lending concerns, on September 2, 2014, VanderSlik contacted Thiele and requested additional time to make the initial payment. Thiele, in turn, granted DLS until September 5, 2014 to make its initial payment. (VanderSlik Aff. at ¶13). VanderSlik continued its efforts to secure financing through its attorney, Nathan VanRyn, but was ulltimately unable to obtain the financing prior to the expiration of the new September 5 deadline. (*Id.*)

During this same time, Thiele and MAS's vice president, Thiele's brother, were out of the country. As a result, MAS's Sales Manager, Josh Hunter ("Hunter") was in contact with VanderSlik and VanRyn. DLS contacted Hunter and sought an additional extension, which Hunter granted through September 8, 2014. (VanderSlik Supp. Aff. at ¶18). In his deposition, Thiele testified that Hunter's extension of the initial payment deadline was valid and that DLS could rely on his representation. (Thiele Dep. at 105).

Despite Hunter's agreement to extend the deadline through September 8, on September 6 Thiele sent the following email sent to VanderSlik:

> Hi Dj. I understand that your attorney has been trying to get a hold of me. I gave you the wire info last week. The money was first to be wired by Wednesday and I agreed to wait until Friday. I have gone above and beyond to accommodate you even though we agreed to something totally different. It was very clear after we

signed the deal at your office as to how transactions were to proceed. The money was supposed to be wired by Friday and I was to [sic] wire the money into escrow. This has not happened. Because you have not complied with the terms and conditions of our agreement, it is no longer valid. We will have to negotiate a new agreement. Also based on the non circumvent agreement, please do not have any direct contact with [CEL].

[DE 58-9].

Through their respective attorneys, MAS and DLS communicated and, ultimately, on September 17, 2014, DLS's counsel emailed MAS's counsel as follows:

Thank you for your work on this. Having reviewed, it looks like the terms of this final agreement are worse for D.J.'s Landscape than the previous agreement you sent yesterday. In other words, we are going in the wrong direction.

In speaking to you earlier today and in speaking to Andrew Thiele on MoNCAy, I gathered that Andrew has another customer he would like to sell this salt to. I would suggest the parties part ways at this point. I will send a short proposed release tomorrow in which D.J.'s Landscape releases Midwest from any possible liability for 'selling the salt under our agreement to someone else.' lack of good faith, etc. and Midwest likewise releases D.J.

Sorry we could not work out a deal.

[DE 58-18). Thiele testified that he believed this email terminated MAS's relationship with DLS. (Thiele Dep. at 134-135). The parties have not provided any evidence indicated mutual releases were signed.

### C. **CEL's Sales to MAS/Grand Ridge**

Whilst all these negotiations with DLS were ongoing, MAS had a potential backup buyer, the Ohio Department of Transportation ("ODOT"), for the CEL rock salt MAS originally planned to sell to DLS. (Thiele Dep. at 115-116). MAS was in the final states of securing a contract with ODOT for the sale of up to 171,600 tons of bulk rock salt, including up to 85,800 tons going to Toledo, Ohio. (Thiele Dep. at 141). On September 8, 2014, Thiele conveyed to John Morgan at CEL that MAS still wanted the vessel of rock salt intended for DLS and that this vessel was to go

to Toledo.  [DE 58-13. Text msg 210].  At some point, the date is not clear, CEL advised Thiele that the shipment MAS sought was unavailable.  (Thiele Dep. at pp. 161-164).

At or around the same time that DLS's counsel advised MAS that they could not work out a deal, John Morgan and VanderSlik had a conversation wherein Morgan conveyed that DLS's "name [was] on the boat," and that the boat was en route to Muskegon – the port contemplated in the BRSSA between MAS and DLS.  VanderSlik replied to Morgan that he "thought the deal was dead."  (VanderSlik Dep. at 98).

On September 26, 2014, CEL, through John Morgan, emailed VanderSlik a document titled Chemical Equipment Labs Bulk Salt Agreement of Sale (the "CEL Agreement") that identified the buyer as "D.J.'s Landscape," or DLS.  (VanderSlik Dep. at 102; Dep. Exh. 60); [DE 56-1, p. 36].  That agreement obligated CEL to sell DLS the same volume of salt that MAS had agreed to sell DLS in the BRSSA, but at a price point that was lower than MAS's sales price to DLS and higher than MAS's purchase price from CEL.  (*Id.*).

On September 29, 2014, VanderSlik emailed John Morgan a signed and revised copy of the CEL Agreement.  [DE 58-22].  Included in the revisions to the original CEL Agreement, is a change of the name of the buyer from DLS to a different entity called Grand Ridge Enterprises, LLC ("Grand Ridge") also operated by VanderSlik.  MAS asserts Grand Ridge is not an operating business and that it owns VanderSlik family vehicles, has no employees, no operations, and the sole owners are VanderSlik and his wife.

However, in his Affidavit, VanderSlik states that Grand Ridge, "performs a multitude of functions," including "the purchase and sale of bulk rock salt."  (VanderSlik Aff. at ¶21).  VanderSlik further explains that Grand Ridge "buys and sells rock salt because it is not a primary business function of DLS and DLS's competitors are unlikely to purchase salt directly from DLS."

(*Id.* at ¶21). VanderSlik admits that in the Fall, 2014, Grand Ridge purchased a shipment of bulk rock salt from CEL. (*Id.* at ¶22).

As part of the CEL Agreement, Grand Ridge was obligated to obtain a letter of credit in favor of CEL for $2,345,200, which was 110% of the contract amount. (John Morgan Dep. at 162); [DE 56-3 at 162]. On October 1, 2014, Kevin Schafer ("Schafer") of the Mercantile Bank of Michigan sent an email to John Morgan with the subject line "DJ's wire." Schafer states in the email that a wire of $1,066,000 was sent from DLS to "the wire instructions sent yesterday." Additionally, the email contained an attachment of an irrevocable standby letter of credit #4500055571 addressed to CEL from the Mercantile Bank of Michigan. The letter of credit was issued in favor of DLS up to the aggregate amount of $1,279,200. (John Morgan Dep. Exh 67); [DE 56-3 at p. 15].

On October 20, 2014, Schafer sent John Morgan a letter explaining as follows:

- Mercantile Bank of Michigan will wire the remaining balance … to satisfy the bulk sales contract between [Grand Ridge and CEL] dated 9/29/14
- Upon receipt of this payment, [CEL] will deem letter of credit #4500055571 as cancelled and no longer eligible to be drawn.

Subsequently, DLS, not Grand Ridge, initiated three wire transfers to CEL on October 1, October 20, and October 21, 2014. Similarly, the load slips produced from DLS's records for salt in 2014 identify DJ's Landscape on the purchase order.

VanderSlik and Morgan testified that CEL first sold salt to Grand Ridge/DLS by the September 29, 2014 contract. (VanderSlik Dep. at 55; John Morgan Dep. at 61). Subsequently, CEL has sold DLS additional 7,000 to 10,000 bags of salt in 2014 and up to 10,000 bags of salt in 2015. (John Morgan Dep. at 63).

### D. CEL's Industry Presence and "Public Domain

CEL has been in the salt-importing business since the late 1980s. (John Morgan Dep. at p. 15). Between January 1, 2014 and December 31, 2015, forty to sixty percent of CEL's sales of bulk rock salt were distributed through the Great Lakes. (*Id.* at 20). CEL has its own brand of salt upon which it places its own name. (*Id.* at p. 25). Morgan testified that prior to August 2014, CEL was known publicly as a bulk rock salt supplier in the Great Lakes region because CEL, "had a history and reputation of supplying salt into the Midwest." (*Id.* at p. 242).

Additionally, prior to August, 2014, CEL attended national trade shows to sell bulk rock salt to new customers, including those in the Midwest. For example, CEL attended the June 2014 Snow and Ice Management Association national trade show and advertised itself as a supplier of bulk rock salt. (John Morgan Dep. at p. 253). Morgan testified that prior to August, 2014, he personally placed information into the public domain establishing CEL as a supplier of bulk rock salt to the Great Lakes and Ohio Valley. (*Id.* at p. 254).

In September, 2014, CEL was featured as a supplier of bulk rock salt in Snow Magazine. [DE 65-9]. In the article, Ed Morgan, advised customers to stock up on bulk rock salt early because of a shortage in the Great Lakes area predicted for later in the season. (*Id.*). Both John Morgan and D.J. VanderSlik testified that each was aware of the other's existence and presence in the bulk rock salt industry. (John Morgan Dep. at pp. 207, 271-272; VanderSlik Dep. at p. 55).

However, VanderSlik further testified that he did not believe prior to August 2014 that CEL shipped into the Great Lakes:

> Q: Prior to that time, August 28, 2014, when you first met Ed and John Morgan, had Dj's ever bought anything from Chemical Equipment Labs?
>
> A: No. They're an East Coast supplier. We had no need to. The logistics at the time made no sense. There wouldn't have been a need.

(VanderSlik Dep. at 55); see also, Deposition of Mark Thiele at p. 147: "They were not a normal shipper into the Great Lakes…"

Similarly Andrew Thiele, in his deposition, testified as follows:

Q.	Do you agree with me if that information was generally available to the public, that [DLS] should not be prevented from using that information?

A.	Ummm – it was not necessarily available to the public.

Q.	What was not necessarily available to the public?

A.	The Chemical Equipment had access to get salt in the [Great] Lakes from Venezuela.

Q.	What about the identity of Chemical Equipment Labs?

A.	It was – I think people on the East Coast knew who they were but they're definitely not commonly known in the Midwest, and most people don't associate the name Chemical Equipment as a company that sells bulk salt.

Q.	How do you know that?

A.	People you speak to.

(Thiele Dep. pp. 197-198; see also, pp. 201, 202).

## DISCUSSION

Before examining the parties' arguments in their respective summary judgment briefs, the Court, for clarity, shall outline the relief sought by the parties in their motions. With respect to MAS's motion, it is a partial motion for summary judgment in that it seeks summary judgment solely on the issue of whether the facts create an absence of a genuine issue showing that DLS breached the terms and spirit of the NCA. It does not seek summary judgment on the issue of whether DLS breached the terms of the BRRSA. In contrast, DLS has moved for summary judgment on both of MAS's claims. Neither party has expressly moved for summary judgment on DLS's counterclaim for breach of contract against MAS. Within these parameters, the Court shall now proceed to address the parties' contentions on summary judgment.

## I.	Cross-Motion for Summary Judgment as to Breach of the NCA

As outlined above, MAS believes that the undisputed material facts entitle it to summary judgment as to whether DLS breached the NCA. Specifically, MAS asserts that DLS, by acting

jointly with Grand Ridge to purchase bulk rock salt through MAS's supplier, CEL, breached the plain language of the NCA. Indeed, MAS points out that the language of the NCA expressly prohibited DLS from purchasing salt directly from CEL: "The Customer is bound by this agreement and agrees not to circumvent Mid-West Salt of Fort Wayne and attempt to purchase salt directly from the named supplier…" (NCA, ¶9). MAS further points out that the interrelation between DLS and Grand Ridge in terms of employees, financing and shipment details, all point to a clear intent by VanderSlik to circumvent the agreement he signed. Specifically, MAS argues, " the fact that VanderSlik signed the purchase agreement with CEL on behalf of Grand Ridge does not relive DLS of liability for the simple reason that DLS – and not Grand Ridge – actually purchased the salt. [DE 55 at p. 11].

In response, DLS argues that MAS is hard-pressed to prove its theory for an entire host of reasons, including the following: (1) there is no evidence that DLS ever acquired an interest in the bulk rock salt purchased from CEL; (2) MAS did not assert in its Complaint any type of joint venture or joint action between DLS and another entity to circumvent the NCA and thus, MAS is improperly attempting to amend its Complaint through its summary judgment brief; (3) on its face, the NCA only applies to DLS; (4) MAS has provided no legal basis to support its theory that DLS can be liable for the acts of Grand Ridge, a separate legal entity; (5) the NCA is unenforceable because MAS terminated the BRRSA; (6) the NCA presents an unreasonable restraint on trade and is unenforceable; and (7) even if the NCA is determined to be reasonable, it is unenforceable because of ¶4 in the NCA which makes the NCA inapplicable if the supplier, here CEL, was known in the public domain as a supplier of bulk rock salt. As will be detailed herein, the Court needn't expound on all of DLS's arguments, as there are multiple grounds upon which MAS's Motion must be denied.

This case embodies routine provisions of contract law. In Indiana, [1] it is well settled that "[t]o recover for a breach of contract, a plaintiff must prove that: (1) a contract existed, (2) the defeNCAnt breached the contract, and (3) the plaintiff suffered damage as a result of the defeNCAnt's breach." *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007). Here, the parties do not dispute that a contract existed, although they do dispute to whom the contract applies. MAS asserts the contract applies not only to DLS but, in essence, its affiliates or any other entities with similar ownership as that of DLS. DLS, in turn, argues that the contract was solely between it and MAS.

"Interpretation of a contract is a pure question of law..." *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 252 (Ind. 2005). If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Dunn*, 836 N.E.2d at 252. Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. *Id.* "We will make all attempts to construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Rogers v. Lockard*, 767 N.E.2d 982, 992 (Ind. Ct. App. 2002). Generally, an ambiguous contract will be construed against its drafter. *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1132 (Ind. 1995).

Here, the language of the NCA clearly provides that the "customer is bound by this agreement." (NCA, ¶9). "Customer" is identified as DLS in the introductory language of the NCA. Thus, on its face, the sole party to whom the agreement applies is DLS – not DLS and its related entities or anyone else. That said, MAS proposes that it should prevail on its motion because DLS and Grand Ridge are related entities and DLS did through the use of Grand Ridge what it could not do in its own right – purchase rock salt directly from CEL. In return, DLS argues

---

[1] The parties are in agreement that Indiana law applies to this case.

that this appears to be a theory borne after the filing of the Complaint as the Complaint itself fails altogether to mention Grand Ridge by name or assert that any entity other than DLS violated the NCA and thus, MAS is barred from making this assertion now.

It is true, as DLS points out, that MAS may not amend its complaint through summary judgment briefing. *See Anderson v. Donahoe*, 699 F. 3d 989, 997 (7th Cir. 2012). But the Court is not altogether convinced that is what has occurred here. Plaintiffs may draft complaints with counts corresponding to the various theories under which they assert entitlement to relief based on the same underlying conduct. The Seventh Circuit has "stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). Attacking counts and legal theories as if they are claims can obscure the differences between them; the legal theories associated with the counts of a complaint "are little more than non-dispositive labels subject to change as allegations yield to evidence over the course of discovery." *Volling*, 999 F. Supp. 2d at 997; *see also Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1004 (N.D. Ill. 2017) ("The precise legal theory, or theories, on which ... a claim may be premised, will be determined not at [the motion to dismiss] stage, but during discovery, in advance of summary judgment and/or at trial.").

Here, the Complaint put DLS on notice that MAS was asserting breach of contract claims. And while the it is true that the Complaint is entirely silent on the assertion, now brought forth in dispositive motions, that DLS acted in concert with Grand Ridge to breach the NCA and/or that Grand Ridge served as the alter ego of DLS to facilitate the breach, the Seventh Circuit has determined that it is at this stage of litigation that theories can be explored. However, what is more concerning for the Court than this pleading situation is that in its briefing, MAS cites not a single

case[2] in support of the legal theory it is now asserting regarding joint action.  Nor does it cite any case law that demonstrates how DLS can be liable for the acts of a separate legal entity (not to mention one not named at all in the Complaint).

Judges are not required to sift through the record without direction from counsel and find evidentiary and legal support for contentions tossed out "like salt strewn on an icy sidewalk," (pun intended), *Heather M. v. Berryhill*, 2019 WL 2386967, at *3 (N.D. Ill. June 5, 2019).  *See, e.g., Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014)(lawyers cannot expect judges to play archaeologist with the record); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Illinois*, 908 F.3d 290, 297 (7th Cir. 2018)("As has become 'axiomatic' in our Circuit, '[j]udges are not like pigs, hunting for truffles buried in' the record.' "); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 (7th Cir. 1992)("... compelling the court to take up a burdensome and fruitless scavenger hunt ... is a drain on its time and resources.").  Rather, while MAS has made attempts to factually characterize the relationship between DLS and Grand Ridge in a way that favors their joint action theory, these facts are either in dispute by DLS or unsupported by any legal authority that would allow a conclusion as a matter of law that DLS breached the NCA.

For instance, MAS presents factual evidence that on September 26, 2014, CEL provided VanderSlik a proposed agreement (later modified) naming DLS as the purchaser.  In response, DLS provides a signed final agreement showing Grand Ridge as the purchaser thereby disputing the factual evidence that DLS had any written agreement with CEL in violation of the NCA.  MAS has not, however, presented any facts demonstrating that DLS actually acquired the salt that was

---

[2] Indeed, MAS cites no cases at all in its briefs other than the basic contract law principles likewise embodied in this Opinion and Order.

purchased from CEL. MAS does presents evidence that the funds for the purchase were wired from DLS and that DLS's bank issued a letter of credit required in the final agreement between DLS and Grand Ridge. These facts are ignored by DLS in their response brief [DE 64] and also in their own summary judgment briefs. But even so, MAS provides no legal authority to convince the Court that (1) these facts make DLS and Grand Ridge "joint actors" in the purchase of bulk rock salt or, (2) that the law provides that the alleged joint action here, if proven at trial, would violate the terms of the NCA. Accordingly, on this basis alone, the Court must deny MAS's motion for partial summary judgment.

But, here is where the case becomes interesting. In its Cross-motion for Summary Judgment, DLS ignores the joint action theory above and asserts two defenses to enforcement of the NCA (even assuming some legal validity to the joint action theory). First, DLS asserts that the NCA was not breached at all because the NCA provides for an exception if the supplier was "known in the public domain as a supplier of bulk rock salt." Second, DLS asserts that the absence of a geographic or temporal limitation on the NCA is per se unreasonable and invalidates its provisions. Because the Court finds the latter argument determinative of the legal issue, it need not definitively address the remaining argument as to whether CEL was known in the "public domain."

DLS asserts that the NCA is akin to a restrictive employment covenant, also known as a noncompetition covenant and that the agreement is overbroad constituting an unenforceable restraint of trade. It is oft recited that Indiana courts disfavor covenants which restrict a person's liberty of action in his business or trade. *Eaton Corporation v. Appliance Valves Corporation*, 526 F.Supp. 1172, 1182 (N.D. Ind. 1981). Accordingly, Indiana courts will not hesitate to strike down any such restrictive covenants which are the least bit overly broad with respect to the "protectible

interest" at stake. *Slisz v. Munzenreider Corporation*, 411 N.E.2d 700, 705 (Ind. Ct. App. 1980). Where the underlying protectible interest is minimal, courts will closely scrutinize the terms of the restraint. *Id.*

In the employment context, "[i]n order to be enforceable, the provisions of a covenant not to compete must be reasonable, which is a question of law." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 913 (Ind. Ct. App. 2011). "To be reasonable, an agreement containing such a covenant must protect legitimate interests of the employer, and the restrictions established by the agreement must be reasonable in scope as to time, activity, and geographic area." *Id.*

Here, DLS contends that the absence of any geographic or temporal limitation in the NCA is *per se* unreasonable and thus, it asserts that the entire NCA is void. In response, MAS argues that the NCA cannot be compared to a covenant not to compete in the employment context and that no Indiana courts have made this comparison. Moreover, it asserts that even without a temporal or geographic limitation, the NCA is limited in scope in that it only prohibits DLS from buying salt from one supplier, CEL. It does not, MAS asserts prohibit DLS from conducting business with other suppliers or in any other market.

MAS is correct that DLS has not cited a single Indiana case applying the principles of covenants not to compete in the employer/employee context to non-circumvention agreements between sophisticated business entities. Indeed, this Court has likewise found no Indiana cases explicitly addressing this issue. Sitting in diversity, this Court's duty "is to decide issues of Indiana state law" by predicting how "the Indiana Supreme Court would decide them today." *Doermer v. Callen*, 847 F.3d 522, 527 (7th Cir. 2017). As such, this Court must "ascertain the substantive content of state law as it either has been determined by the highest court of the state

or as it would be by the court if the present case were before it now." *Golden v. State Farm Mut. Auto. Ins. Co.*, 745 F.3d 252, 255 (7th Cir. 2014) (citations omitted).

Without question, Indiana has made its view known that employment non-competition agreements are disfavored, closely scrutinized for reasonableness, and strictly construed against the employer. *Licocci v. Cardinal Assocs., Inc.,* 445 N.E.2d 556, 561 (Ind. 1983). The reasonableness assessment in Indiana requires a balancing of interests between the covenantor, covenantee, and the public interests as well as reasonable temporal and geographic limitations. *Id.* This stems from the imbalance of bargaining power that occurs between the employer and the employee in such a negotiation. Indeed, it is for this reason that the law extends additional precautions when evaluating those types of restrictive covenants. *See Clark's Sales & Serv., Inc. v. Smith, 4 N.E.3d 772, 780* (Ind.Ct. App. 2014).

Outside of the employer/employee context, Indiana has held that noncompetition agreements ancillary to the sale of a business are not as "ill-favored at law" as employee covenants, but these agreements still must contain an element of reasonableness. *Fogle v. Shah,* 539 N.E.2d 500, 502 (Ind.Ct.App.1989). The different treatment in the degree of reasonableness results, in part, from the disparate bargaining power enjoyed by one selling a business as compared to an employee who has only labor and skill to offer. *Id.*

This view is consistent with the view some courts have expressed when the parties are corporate entities on equal bargaining ground. In *U.S. Data Corp. v. RealSource, Inc.,* 910 F.Supp. 2d 1096, 1105 (N.D.Ill.2012), 1096, 1105 (N.D.Ill.2012), the court noted that Illinois law does not afford the same protections it gives to former employees to corporations that are dealing with each other at arms-length since the balance of power is equally distributed, see also *Owens Trophies, Inc. v. Bluestone Designs & Creations, Inc.*, 2014 WL 126082, at *3 (N.D. Ill. Jan. 14, 2014)

(refusing to apply strict reasonableness standards to non-circumvent agreement with "independent, sophisticated corporations dealing at arms-length" because "in such a situation … the imbalances between the parties do not exist."). Other courts have concluded otherwise, *see Eden Hammon & Co., v. Sumitomo Tr. & Banking Co.,* 914 F.2d 556, 560-63 (4th Cir. 1990) (applying Virginia standard for employment non-compete provisions to non-circumvent agreement); *Swartz Investments, LLC v. Vion Pharm., Inc*., 556 S.E.2d 460, 463 (2001) (construing non-circumvent agreement as a restrictive covenant and determining under Georgia law that the highest level of scrutiny was required despite equal bargaining power because there was no additional consideration for the covenant at issue).

While Indiana has not explicitly held that non-circumvent agreements between parties of equal bargaining power are held to the strict scrutiny of employment arrangements, this Court need not reach that ultimate conclusion here because even under lesser scrutiny, the NCA cannot be enforced here, as it is unreasonable on its face. There is no doubt that MAS has a legitimate interest in protecting its relationship with its suppliers so as not to be taken advantage of by would-be competitors interested in reselling bulk rock salt. However, to protect that valid interest the NCA must be reasonable and not broader than necessary to protect that interest. Here, the NCA contains absolutely no temporal limitation as to when, if ever, DLS could contract with CEL directly. When asked in his deposition, Thiele indicated that he believed the agreement extended only for a single season; yet, that is not contained anywhere in the agreement. Indeed, the agreement as written could go on in perpetuity. Likewise, it had no geographical restriction about the market being served.[3] One could surmise a situation in which DLS had business dealings outside of the Midwest

---

[3] Moreover, while MAS makes much of the fact that DLS was only limited in its interactions with one supplier, it neglects the facts, discussed in the briefing and throughout the record, that there was a shortage

market served by MAS and no harm to MAS would result by DLS servicing their existing clientele outside the Midwest. For these reasons, the Court concludes as a matter of law that the NCA was overly broad and unenforceable. DLS's Motion for Summary Judgment as to MAS's claim for breach of the NCA is GRANTED.[4]

## II. DLS's Motion for Summary Judgment as to Breach of the BRSSA

Next, DLS seeks summary judgment on MAS's claim that DLS breached the BRSSA when it was unable to obtain financing to broker the deal for the purchase of bulk rock salt by the due date. Under Indiana law, it is a general principle that " '[a] party first guilty of

---

of salt supply for the Midwest. These facts further convince the Court that the restriction without any limitations period is against the public interest and overly broad.

[4] Although it is not necessary for the Court to reach an ultimate conclusion on whether CEL's identity was in the public domain, it is noteworthy that based on the facts this issue would be a jury question. Paragraph 4 of the NCA provides an exception to the confidentiality restrictions in ¶3 for "any information which: (a) is already in the public domain or becomes available to the public through no breach of this Agreement by the receiving party …" (*Id.* at ¶4a). "Confidential Information" is further defined in the NCA as "information and data describing the product, name of the supplier, shipping contractors, product pricing, product samples, product specifications, and product information." (NCA ¶1). "Public domain" is not a defined term in the NCA but ¶5 of the NCA provides, "Confidential information shall not be deemed to be in the public domain merely because any part of said information is embodied in general disclosures or because individual features, components or combinations thereof are now or become known to the public." (NCA, ¶5).

Here, the facts raise genuine questions of material fact as to interpretation of the term "public domain" as contemplated in the agreement and to what information that extends. There is testimony that prior to execution of the NCA, CEL was known as a supplier of bulk rock salt, at least, in the East Coast region. Morgan testified that he believed CEL was known throughout the Midwest and had established itself in that market. (Morgan Dep. at 242). The evidence reflects that CEL attended trade shows, was advertised in trade publications and VanderSlik testified that he was well aware of CEL's presence in the bulk rock salt market prior to August 2014 because they had attended trade shows together. However, VanderSlik further testified that he did not believe prior to August 2014 that CEL shipped into the Great Lakes. (VanderSlik Dep. at 55); see also, Deposition of Mark Thiele at p. 147: "They were not a normal shipper into the Great Lakes…" and (Thiele Dep. pp. 197-198; see also, pp. 201, 202). Thus, there is at least some factual dispute as to whether, in fact, CEL was truly known in the public domain (at least with respect to the Great Lakes region), what "known in the public domain" means, and what information from CEL was available in that public domain Moreover, there are limited facts on exactly what information DLS alleges was *in* the public domain. Indeed, the NCA defines "confidential information" as an entire host of information, not merely the identity of the entity. Thus, if the Court had not concluded as it did with respect to the reasonableness of the NCA, a question of fact would remain on this issue.

a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract.' " *Klepper v. ACE American Ins. Co.,* 999 N.E.2d 86, 96 (Ind.Ct.App.2013) (quoting *Illiana Surgery & Med. Ctr., LLC v. STG Funding, Inc.,* 824 N.E.2d 388, 403 (Ind.Ct.App.2005)), *reh'g denied, trans. denied.* Here, DLS asserts that MAS breached the BRSSA first when it unilaterally terminated the agreement on September 6, prior to the expiration of the modified payment deadline of September 8, 2014. As a result, DLS believes its non-performance to secure financing and payment is excused.

In its response, MAS asserts a slew of arguments that it says precludes summary judgment. First, it argues that the modification of the payment deadline was invalid as there was no signed writing evidencing the parties' agreement extending the payment deadline to September 8, in violation of the statute of frauds and Indiana's Uniform Commercial Code, Ind. Code §26-1-2. Second, it asserts that a question of fact exists as to whether Thiele's correspondence to DLS on September 6, 2014 constitutes a material breach of the contract. Third, MAS argues that "even if" Thiele's communication to DLS can be deemed a repudiation of the contract, the ongoing negotiations that follow demonstrate a retraction of such repudiation. Fourth, MAS argues that "even if" it can be deemed to have extended the payment terms, DLS did not detrimentally rely upon those promises of MAS when it failed to purchase bulk rock salt from MAS. Fifth, MAS did not waive its right to DLS's performance under the BRSSA. Finally, it argues that a genuine issue of material fact exists as to whether MAS acted in a commercially reasonable manner.

The Court begins by noting that the parties' scattershot arguments, which seem to just throw everything at the wall and see what sticks, makes it difficult for this Court to discern precisely what the disputed facts are or aren't let alone whether DLS's Motion for Summary

Judgment is well-taken.  The Court can start with the obvious, which is, that there is no genuine issue of material fact that the parties entered into the BRSSA.  That agreement obligated MAS to supply certain amounts of bulk rock salt at certain times in exchange for payment by a certain deadline.  There is no argument from either side that on its face, this is a valid contract that is binding and enforceable.  Thus, the valid existence of the BRSSA is not in dispute.

What *is* in dispute, is virtually everything that occurred after the signing of the BRSSA and before performance was due on either side.  For instance, DLS asserts that the payment deadline was validly extended by Hunter, MAS's agent, until September 8, 2014; MAS asserts it was not because Hunter did not put this modification in a writing acknowledged by DLS.  Yet, MAS also acknowledges that an oral extension was offered, and Thiele testified that DLS could rely on Hunter's oral extension.  (Thiele Dep. at 105).

Pursuant to Ind. Code §26-1-2-209(3) (hereafter "UCC §2-209(3)") and §26-1-2-201 (hereafter, "UCC 2-201(1)") contracts for the sale of goods over $500, and modifications to such contracts, must be memorialized in a signed writing signed by the party sought to be held to that term. DLS asserts that Hunter's email to Thiele, that contained an email signature from Hunter is sufficient to meet this requirement.  Hunter's email to Thiele reads as follows: "[DLS] asked if we could date the contract until [Monday, September 8, 2014] and I said that should not be a problem; I did inform why we are short dating the deals.  I will follow up with him yet today and see what has transpired." [DE 58-8].  This email was followed by Hunter's email signature.  That signature, assuming the email was intended as a modification is a valid signature pursuant to the UCC.  *Cloud Corp. v. Hasbro, Inc.*, 314 F.2d 289 (7th Cir. 2002) ("the sender's name on an e-mail satisfies the signature requirement of the statute of frauds.").  This begs the question, however, as to the intent of the parties.  This email does not include anyone from DLS at all and what is more

critical here is that the email does not state definitively that the date has been extended nor does it state that it has not been extended. It simply states " it should not be a problem." Thus, it is subject to interpretation based on the intent of the individuals involved.

That said, DLS argues that even if the above writing was not sufficient under the statute of frauds, MAS waived the statute of frauds defense. Indeed, UCC 2-209(4) provides that parties to a sales contract may waive a requirement that any changes to the contract must be in writing. In essence, this rule prevents a party from invoking the statute of frauds where doing so would result in a windfall to such party. Consequently, an oral agreement may be enforced when a party has acted in reliance on the agreement to its detriment and to the benefit of the other party. *See, e.g., Cloud Corp. v. Hasbro, Inc., 314 F.3d 289, 297-98 (7th Cir. 2002)* ("an attempt at modification that does not satisfy the statute of frauds nevertheless can operate as a waiver" if the party seeking to enforce the oral contract can show that she "reasonably relied on the other party's having waived the requirement of a writing," *or* "that the waiver was clear and unequivocal").

On both these issues, questions of fact abound as to the intent of the parties with respect to the modification of the payment deadline. The facts from the email between Hunter and Thiele suggest, at the very least, that there existed some intention to extend the deadline. Thiele's testimony that it was reasonable for DLS to rely on Hunter's oral statements extending the modification also points in that direction. In turn, DLS's continued work to finance the deal, and incurring continued legal fees to do so likewise suggests that all parties intended to extend the deadline. However, Thiele then terminated the contract three days prior to the alleged modification deadline suggesting that perhaps it was not his intent to extend the payment deadline. All of these facts and the intentions of the parties in these negotiations, cannot be resolved by the Court at this

stage of the litigation. They must be resolved by the fact-finder and through credibility determinations.

In essence, DLS, through its motion and its corresponding counterclaim, seeks a determination of who breached the BRSSA first. Until the facts are decided through the fact-finding process, it is impossible for the Court to make this determination. Indeed, if the parties intended the payment deadline modification to be valid and DLS reasonably relied on that modification, it is disingenuous for MAS to claim that the absence of a writing excuses it from its conduct, i.e., it waived the statute fraud defense. At that point, however, there are more factual issues to be resolved as to the subsequent conduct of the parties. As MAS points out a factual issue exists as to whether Thiele's termination of the BRSSA prior to the modified payment deadline running constitutes a material breach in light of his attempts to immediately "renegotiate" the terms of the original deal. None of these issues are suitable for summary disposition until, at the very least, the evidence at trial provides some clarity as to the underlying facts and the parties' intentions. For this reason, DLS's Motion for Summary Judgment as to MAS's claim for breach of the BRSSA is DENIED.[5]

## **CONCLUSION**

Based on the foregoing, MAS's Motion for Partial Summary Judgment [DE 54] on its claim that DLS breached the NCA is DENIED. DLS's Motion for Summary Judgment [DE 57] is GRANTED as to MAS's claim that DLS breached the NCA and DENIED as to the claim for breach of BRSSA. The Court, by way of separate minute entry, shall schedule an in-person status and scheduling conference to be followed by a settlement conference with the Magistrate Judge.

---

[5] The Court shall not address all the additional arguments raised by MAS as they all fall victim to the same result as the initial arguments. A jury needs to assess the credibility of the witnesses and determine their intent.

The parties shall come to that conference prepared to discuss their respective damages they seek on the remaining claim and counterclaim for breach of the BRSSA.

Entered:  This 24th day of June, 2019

s/ William C. Lee<br>
United States District Court